*272 Maupin, J.,
concurring in part and dissenting in part:
The internal inconsistency that marks our jurisprudence on the economic loss doctrine is not unique to Nevada. Almost every state that has adopted the economic loss rule has carved out discreet exceptions that to some degree undermine the public policies behind it. The majority on rehearing in this matter, I believe, substantially reconciles our prior authority on this subject and, in large part, provides a reasonable synthesis that will facilitate predictability in the future. I write separately to expand on the history behind the economic loss doctrine in Nevada and because I believe the majority may have unnecessarily broadened its scope.
The starting point of any analysis of our version of the rule must be Local Joint Executive Board v. Stern, 98 Nev. 409, 651 P.2d 637 (1982). In that case, former employees of the MGM Grand Hotel sought to recover lost salaries and employment benefits for the period during which the resort remained closed following a catastrophic fire in November 1980. This court reaffirmed the common law rule that, “absent privity of contract or personal injury or property damage,’ ’ a plaintiff may not recover in negligence or strict tort liability for purely economic losses. Id. at 411, 651 P. 2d at 638. We consistently applied Stern to prevent tort recovery for purely economic losses in Central Bit Supply v. Waldrop Drilling, 102 Nev. 139, 717 P.2d 35 (1986) (holding that economic losses in connection with a broken drill bit could only be recovered under a breach of warranty theory), and in Arco Product Co. v. May, 113 Nev. 1295, 948 P.2d 263 (1997) (ruling that loss of sales by a convenience store from allegedly defective inventory control system could not, as a matter of law, be the subject of a negligence or strict tort liability claim).[1]
As noted, a general statement of the “economic loss” rule is that recovery for purely economic losses may not be had in tort. Our decisions in Stem, Central Bit and Arco demonstrate this court’s clear and continuing embrace of the economic loss doctrine. There are several corollaries to the economic loss rule. First, claims for personal injuries and/or property damage do not implicate the economic loss rule. Second, economic losses are recoverable in tort only when they are incidental to claims for personal injuries and/or property damage. Third, when a product causes injury to itself, i.e., where a defective component of an integrated product damages all or part of the remaining whole, the damages are purely economic, leaving the parties to the acquisi *273 tion of the product to their contractual remedies. Fourth, a product that injures “other property” causes property damage recoverable in tort. See American Law of Products Liability (3d) § 60:36, at 66. We have directly or impliedly adopted these correlative principles in all of our cases dealing with this subject.[2]
The primary policy behind the rule articulated in Stern is to:
shield a defendant from unlimited liability for all of the economic consequences of a negligent act, particularly in a commercial or professional setting,[3] and thus to keep the risk of liability reasonably calculable.
Stern, 98 Nev. at 411, 651 P.2d at 638 (emphasis and footnote added).
The majority in this matter has most ably articulated the history behind the rule and the divergence in scope between tort and contract based recovery.[4] As also noted by the majority, the fundamental policy behind this rule is to restrict parties to commercial transactions to contractual remedies based simply upon the foreseeability of loss of financial expectancies. Unfortunately, beyond Stern, Central Bit and Arco, several of our other cases have obscured the scope of the economic loss rule.

Oak Grove Investors v. Bell & Gossett Co.

In Oak Grove Investors v. Bell & Gossett Co., 99 Nev. 616, 668 P.2d 1075 (1983), a case decided only one year after Stem, this court discussed the economic loss doctrine in the context of a “construction-defect” dispute. A unanimous court concluded *274 that a negligence and strict tort liability claim arising from a defective plumbing fitting should not have been dismissed on statute of limitation grounds, or because of a failure of proof as to whether a defect with regard to the fitting had been shown. Although not necessary to the decision, this court went on to observe via obiter dictum that water leakage caused “substantial leakage of water throughout, and damage to, the apartment [sic] within the . . . complex.” Oak Grove, 99 Nev. at 625, 668 P.2d at 1080. From this factual pattern, this court concluded that the water damage claim in Oak Grove constituted “property damage” for purposes of an “economic loss” analysis.[5] Thus, a completed entity that “injured itself” caused “property damage,” taking the case out of the economic loss doctrine.[6]
National Union Fire Insurance v. Pratt and Whitney
An attempted extension of the policy behind the economic loss doctrine is reflected by our split decision in National Union Fire Insurance v. Pratt and Whitney, 107 Nev. 535, 815 P.2d 601 (1991). In that case, this court embraced the well-accepted rule, noted above, that a plaintiff may not recover in tort for the loss of a product that injures itself. In Pratt and Whitney, this court considered an entire airplane a ‘ ‘product’ ’ for the purpose of the economic loss rule. Thus, this court rejected the notion that a readily identifiable component part of the aircraft, namely the engine, was the cause of “property” damage, to wit: the destruction of the entire aircraft. This approach is consistent with that taken by the United States Supreme Court in East River S.S. Corp. v. Transamerica Delaval, 476 U.S. 858 (1986) (a steamship injuring itself causes pure economic loss). However, in its analysis of this issue, the Pratt and Whitney opinion contains several problematic justifications of its result that have serious implications with respect to the scope of the rule in the context of construction defect litigation.
First, the majority attempted to distinguish Oak Grove with the following observation:
In Oak Grove, however, there was little factual basis for invoking the economic loss doctrine. Indeed, rather than receding from our rulings in Stem and Central Bit Supply,[7] we concluded, by way of dictum, that the factual scenario in *275 Oak Grove did not implicate the economic loss doctrine because it involved a defective heating and plumbing system that caused water leakage and damage throughout the apartment complex. It was thus clear that, in contrast to the instant case, Oak Grove did not involve a single integrated product that “injured itself.” The apartment complex there consisted of a number of separate apartment units that were each self-contained and constructed for the separate occupancy of the end users. Indeed, this court has not yet entered the fray among courts as to whether even a “house” constitutes a product for purposes of the law of strict products liability, let alone an entire apartment complex.
Pratt and Whitney, 107 Nev. at 538-39, 815 P.2d at 603 (footnote added).
The primary distinction drawn by the majority between Pratt and Whitney and Oak Grove involved the fact that a component part of one apartment unit damaged other units in the complex rather than a component part of a single integrated entity (or apartment unit) causing injury to itself. This seemingly ignores the fact that Oak Grove does not, in its dictum on the subject, draw any distinction between damages to the individual units in which the fittings were installed and damages caused by any one fitting to any or all of the other units. Further, in Oak Grove, the offending fittings had been installed in all of the separate apartment units. Thus, we cannot determine from the facts of Oak Grove whether the water damage resulting from any one fitting caused damage to “other property,” to wit: the other units.
Secondly, the Pratt and Whitney majority observes that the economic loss doctrine was never intended to apply to construction projects that “reflect the products and efforts of so many different manufacturers, laborers, crafts, supervisors and inspectors in the creation of an essentially permanent place of habitation.” Pratt and Whitney, 107 Nev. at 539, 815 P.2d at 603. Of course, this comment applies with equal force to the manufacture of an airplane—a much more complex entity than many commercial or residential buildings.
Third, the Pratt and Whitney majority notes that commercial products that injure themselves are readily insurable, and thus, suitable for inclusion in the economic loss doctrine. This distinction is questionable because residential and commercial structures are also readily covered by first-party casualty insurance.
Thus, the distinctions attempted did not demonstrate a sufficient doctrinal reason as a matter of public policy to justify variant treatment for these purposes between apartment, commercial or home construction on one hand, and complex conveyances *276 such as automobiles, steamships or airplanes on the other. Again, airplanes as well as apartment complexes or houses are self-contained entities that are the end result of an integration of hundreds, if not thousands of component parts. Thus, in my view, Pratt and Whitney cannot be reconciled with this court’s decision in Oak Grove.
Notwithstanding the statements made in Pratt and Whitney, and as noted by the majority in this case, there are numerous cases from other jurisdictions in which the economic loss doctrine is applied to construction defect cases. Given the parallel policies that could apply to both construction and products defects cases, Pratt and Whitney should have rejected the dictum in Oak Grove as no longer valid. I therefore agree that the economic loss doctrine is generally implicated when a product or an integrated piece of construction injures itself.[8] This, of course, is the position taken by the U.S. Supreme Court in East River.[9] Thus, Stern, Central Bit, Arco and Pratt and Whitney (excepting its attempt to distinguish Oak Grove) all represent a sound and consistent application of the economic loss doctrine.[10]
However, in the situation alluded to by the majority in Pratt and Whitney, where a defect in one unit of a multiple occupancy structure causes property damage throughout the building, I would leave the issue of whether “other property” has been damaged to a case-by-case factual analysis. Such factual issues should turn on whether each unit is self-contained. Thus, to the extent that the *277 same alternate scenario exists in this case, I would partially dissent from the majority.
Going further, when an identifiable component part added to the original “product” or an original piece of construction injures or damages all or part of the remainder, the added component is “other property” that may be defective from a negligence or strict liability standpoint. Thus, the added component injures “other property” for tort recovery purposes. See Worrell v. Barnes, 87 Nev. 204, 484 P.2d 573 (1971), Saratoga and the fourth corollary discussed above.[11] Again, this notion would seem to apply equally well to products and construction litigation.
Worrell v. Barnes
According to the majority, Worrell v. Barnes wrongly held that contractors were not in the business of “manufacturing” or selling products “within the ambit of section 402A” of the Restatement (Second) of Torts.
The property damage in Worrell resulted from a residential fire allegedly caused by a portion of a heating system installed by the defendant during a remodeling project. This court concluded that the contractor “manufactured and sold a ‘product,’ ” which included a defective gas fitting and the portion of the gas water heating system installed during the remodeling project. Worrell, 87 Nev. at 208, 484 P.2d at 576. While the contractor did not actually manufacture the fitting, he was deemed in Worrell to have manufactured a product, to wit: the fitting and, at least impliedly, the newly installed portion of the plumbing system. Interestingly, the Worrell court implied that the doctrine of strict tort liability would apply to any kind of defect in construction, regardless of whether the defect was part of the original construction, or added subsequent to completion:
The ordinary purchaser is not more capable of detecting a defect in a chimney flue or vent of a heating apparatus (,Schipper; supra) or faulty plumbing covered by a concrete slab foundation (Humber; supra), in a house erected by a builder of two than in one constructed by a quantity builder of 200. Avner v. Longridge Estates, 77 Cal.Rptr. 633 (Cal.App. 1969); 1969-70 Annual Survey of American Law, p. 474; 13 A.L.R.3d 1057, 1097 (1967). When a plaintiff proves that while he was using an instrumentality in a way it was intended to be used he was injured as a result of a defective design and/or manufacture which made the instrumentality unsafe for its intended use, and that he was unaware of the defect his burden has been accomplished. Restatement of Torts 2d, Comment G, § 402A. An owner relies upon the *278 skill of the fabricator of a piping system, and he has a right to expect freedom from injury on the basis of the fabricator’s superior knowledge.[12]
Worrell, 87 Nev. at 207, 484 P.2d at 575-76 (footnote added).
The Worrell court did not reach the issue of whether the economic loss rule was implicated in a construction defects suit where the finished or remodeled construction damaged itself. However, for future reference, an analysis of the economic loss doctrine under the facts of Worrell is instructive.
To compare, the primary damages deemed recoverable in toft via negligence or strict liability in Oak Grove were arguably economic losses. Thus, notwithstanding the language quoted immediately above, had the gas fitting in Worrell been part of the original construction, the damages would have been restricted to economic losses. However, the losses actually sustained as described in Worrell were not pure economic losses under East River, Pratt and Whitney and Saratoga because an outside component was incorporated into the original construction, which caused damage to “other property.” Therefore, in my view, had we reached the issue of whether pure economic losses had been sustained in Worrell, the outcome would have remained unchanged. I also believe that the component parts or subsystems of a house or other building implicate strict liability and negligence issues when personal injuries from construction defects have been sustained or where the defective building component damages “other property,” such as a free standing neighboring dwelling.
I concede that the fact pattern in Worrell does not fit neatly within the Restatement Second formulation. However, I would leave Worrell intact and interpret it as invoking a salutory and beneficial public policy allowing recovery when a defect in an addition to a structure causes property damage to the remaining whole, or causes personal injuries, or causes property damage to other structures or self-contained but attached units.

CONCLUSION

While I agree that the economic loss rule is implicated in con *279 straction defect litigation, I believe that application of the rule should be limited as suggested above.[13]

Stern may arguably be read to imply that a plaintiff may recover purely economic losses in tort if he also has a contractual relationship with the defendant. Central Bit, in my view, dispels this notion in its holding that a plaintiff with express or implied indemnity rights must bring suit in contract, not in tort.

The third and fourth of these corollaries were examined in the United States Supreme Court cases of East River S.S. Corp. v. Transamerica Delaval, 476 U.S. 858 (1986), Saratoga Fishing Co. v. J.M. Martinac & Co., 520 U.S. 875 (1997), and in our decision in National Union Fire Insurance v. Pratt and Whitney, 107 Nev. 535, 815 P.2d 601 (1991). See the discussion below.

Our cases have never made it clear what the Stem court meant by its statement of protection from tort liability in the “professional” setting. Certainly, economic losses without property damage or personal injury have been deemed recoverable in tort in connection with various types of professional malpractice/negligence claims.

In Bernard v. Rockhill Development Co., 103 Nev. 132, 135, 734 P.2d 1238, 1240 (1987) (quoting Malone v. University of Kansas Medical Center, 552 P.2d 885, 888 (Kan. 1976)), we observed:
A breach of contract may be said to be a material failure of performance of a duty arising under or imposed by agreement. A tort, on the other hand, is a violation of a duty imposed by law, a wrong independent of contract. Torts can, of course, be committed by parties to a contract. The question to be determined ... is whether the actions or omissions complained of constitute a violation of duties imposed by law, or of duties arising by virtue of the alleged express agreement between the parties.

Oak Grove cites Worrell v. Barnes, 87 Nev. 204, 484 P.2d 573 (1971), for the limited proposition that strict tort liability applies to claims for property damage as well as to personal injury cases. This court did not reach “economic loss” issues in Worrell.

See the first corollary to the rule discussed above.

Central Bit was actually decided subsequent to Oak Grove.

The reason I would not overturn Pratt and Whitney is that it would be difficult, if not impossible, to determine where to draw the line as to when the doctrine would be implicated when a commercial product injures itself. For example, an electric lamp can destroy itself because of an electric malfunction and is made up of component parts. No one could seriously debate whether the economic loss doctrine applies to a suit against the wiring manufacturer for loss of the lamp or loss of income from its projected use.

This doctrine has recently been refined in Saratoga Fishing Co. v. J.M. Martinac & Co., 520 U.S. 875 (1997), in which economic losses were deemed recoverable where the product, a steamship, injured “other property,” to wit: equipment added to the original assembly of a ship by the original purchaser.

The majority correctly overturns Charlie Brown Construction Co. v. Boulder City, 106 Nev. 497, 797 P.2d 946 (1990). Charlie Brown is the one case that cannot be reconciled with any of our other decisions on the economic loss doctrine. Citing Hadley v. Baxendale, 156 Eng. Rep. 145 (1854), Charlie Brown, at least by implication, embraced in the tort context a rule of general foreseeability that has historically applied in contract but not in tort. Thus, taken literally, Charlie Brown arguably eviscerated the economic loss doctrine. I am certain this was not the intent of this court in Charlie Brown. Thus, it is important that we finally eliminate any misconceptions in this regard.

See Note 2.

I take issue with the majority’s reference to Casa Clara v. Charley Toppino, 620 So. 2d 1244, 1247 (Fla. 1993). New home purchasers do not generally have a “meaningful” ability to inspect houses for defects. Further, unlike the situation of a purchaser of a pre-owned residence, a new home-buyer’s power to bargain over price in the modern market can only be described as marginal at best. Thus, I would reject such considerations in determining the efficacy of applying the economic loss doctrine in this context.

In an appropriate future case, we may be called upon to determine whether lack of privity of contract between property owners and remote subcontractors bars recovery under various implied warranties when a defect in construction causes a problem that is restricted to economic loss (i.e., where the claimant is restricted to his, her or its recovery in contract). To the extent that building construction is treated by the majority as analogous to an integrated product for economic loss considerations, we may wish to examine whether this court’s ruling in Hiles v. Johnson Pump Co., 93 Nev. 73, 560 P.2d 154 (1977), should apply by analogy to implied warranty claims made in this context. This issue is not before us because appellants’ warranty claims were voluntarily dismissed below.