BRUCE KIRKPATRICK, Petitioner, v. THE EIGHTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA, IN AND FOR THE COUNTY OF CLARK, AND THE HONORABLE ROBERT E. GASTON, District Judge, Family Court Division, Respondents, AND SIERRADAWN KIRKPATRICK CROW, Real Party in Interest.

No. 37593

April 11, 2002                                    43 P.3d 998

YOUNG, J., and SHEARING, J., with whom MAUPIN, C. J., agreed, dissented.

*Gayle F. Nathan,* Las Vegas, for Petitioner.

*Bruce I. Shapiro,* Henderson; *Rebecca L. Burton,* Las Vegas, for Real Party in Interest.

238

**OPINION**

By the Court, AGOSTI, J.:

In this case we are asked to determine the constitutionality of NRS 122.025, which permits a minor under the age of sixteen to marry with the consent of one parent and the district court's authorization. Under that statute, the district court permitted petitioner's fifteen-year-old daughter to marry a forty-eight-year-old man. Although the daughter's mother had provided consent, petitioner had no knowledge that his daughter was planning to and ultimately did undergo a marriage in Nevada. Because petitioner, who had an on-going personal and custodial relationship with his daughter, was provided neither notice nor an opportunity to be heard before his daughter was given judicial permission to marry, NRS 122.025 was unconstitutionally applied in this instance. Additionally, the district court manifestly abused its discretion when it failed to identify any extraordinary circumstances warranting the marriage and failed to expressly consider the daughter's best interests. Accordingly, we grant this petition for extraordinary relief.

*FACTS*

Fifteen-year-old SierraDawn Kirkpatrick Crow (''Sierra'') is the daughter of Karen Karay and petitioner Bruce Kirkpatrick. In

1990, Karay and Kirkpatrick were divorced in California. As part of the divorce decree, Karay and Kirkpatrick were awarded joint legal and physical custody of Sierra. In 1992, Karay and Sierra moved from California to New Mexico. After the divorce, Kirkpatrick maintained a relationship with his daughter through telephone conversations, and visits with her in New Mexico and California. Sierra spent the 2000 Christmas holiday with Kirkpatrick in California. The record suggests that Kirkpatrick may have had physical custody of Sierra in California during the late 1990s.

In late December 2000, shortly after Sierra turned fifteen years old, she informed her mother that she desired to marry her guitar teacher, forty-eight-year-old Sauren Crow. Under New Mexico law, a minor under the age of sixteen is not permitted to marry unless the marriage legitimizes a child born out of wedlock or the minor is pregnant.[1] Because Sierra was not pregnant and had no children, she could not marry Crow in New Mexico. In Nevada, however, a minor under the age of sixteen may marry if he or she has the consent of one parent and the district court's authorization.[2] Thus, Sierra, her mother and Crow traveled to Las Vegas so that Sierra could take advantage of Nevada's marriage consent law and seek judicial permission to marry Crow.

On December 29, 2000, Karay filed a petition with the Clark County district court to obtain judicial authorization for Sierra's marriage. With the petition, Karay filed a conclusory affidavit consenting to the marriage, in which she simply stated that Sierra and Crow were "right for each other," that they had "very real life plans," and that "their talents [would] be most effectively utilized by [the] marriage."[3] Without conducting a hearing or inter-

---

[1] N.M. Stat. Ann. § 40-1-5; N.M. Stat. Ann. § 40-1-6(B).

[2] NRS 122.025.

[3] Karay's affidavit stated, in full, as follows:

> I, Karen Karay, have completed the Court filing process and been assigned a case number and Family Court Department Judge. My party and I tried every option possible to complete the award of Court Approval for the Marriage of my Minor Daughter Under the age of 16, by this Court. When we were to appear before the Judge, there were none to be found, anywhere, due to the long weekend.
>
> For business and professional reasons I am unable to remain in Las Vegas through the long New Year's weekend, and finish the business on Tuesday.
>
> I, as parent of SIERRADAWN KIRKPATRICK have fully granted consent to her marriage to SAUREN CROW. It is my sincere desire for the two to be married, as planned, as I have seen no other couple so right for each other.
>
> SIERRA and SAUREN have very real life plans at home, in the town in which we all reside. Their partnership and their talents will be most effectively utilized by this marriage.

viewing Karay, Sierra or Crow, the district court summarily found that good cause existed under Nevada law for the marriage, and ordered that a marriage license be issued to Sierra and Crow. On January 3, 2001, Sierra and Crow were married in Las Vegas.

When Kirkpatrick first learned of Sierra's marriage, he sought an ex parte temporary restraining order in the New Mexico district court. That court granted the temporary restraining order, and awarded Kirkpatrick immediate legal and physical custody of Sierra. Four days later, however, the court rescinded its order because it found that Sierra's marriage was valid under Nevada law, and that Sierra was emancipated as a result of the marriage.[4]

Kirkpatrick then moved the Clark County district court to vacate its earlier order authorizing Sierra's marriage. Kirkpatrick also sought to have the marriage annulled. Following a hearing, during which Kirkpatrick was present and Sierra and Crow were physically absent, but were represented by counsel, the district court entered an order denying Kirkpatrick's motion, concluding that the marriage complied with Nevada law and determining that Kirkpatrick lacked standing to challenge the marriage's validity.

Thereafter, Kirkpatrick filed this petition seeking a writ of mandamus to compel the district court to vacate its order authorizing Sierra's marriage, and to annul the marriage.

## DISCUSSION

### Propriety of writ relief

A writ of mandamus is available to compel the performance of an act that the law requires as a duty resulting from an office, trust, or station.[5] But we will not issue a writ of mandamus to control a trial court's discretionary action unless the court has manifestly abused its discretion.[6] Additionally, a writ of man-

---

Please grant this request before you, to SIERRA and SAUREN, also before you, who will be completing this Approval, per compliance with Court consent just after the New Year. Your timely approval will allow SIERRA to be back in school, when it resumes on January 8, 2001.

[4]At common law, marriage is generally sufficient to constitute emancipation. *See* 1 Donald T. Kramer, *Legal Rights of Children* § 15.04, at 672 (2d ed. 1994). Although NRS 129.080 provides that a child who is at least sixteen years of age, married or living apart from his parents, may petition the court for a judicial decree of emancipation, this statutory provision does not expressly abrogate the common law effect of marriage as emancipating a minor. It does not appear that judicial action is required for emancipation to occur. A judicial decree, however, provides an emancipated minor with tangible evidence of his or her emancipated status.

[5]NRS 34.160.

[6]*Round Hill Gen. Imp. Dist. v. Newman,* 97 Nev. 601, 603-04, 637 P.2d 534, 536 (1981) (citation omitted).

damus is not available if the petitioner has a plain, speedy, and adequate remedy in the ordinary course of law.[7] Mandamus is an extraordinary remedy, and it is within the discretion of this court to determine if a petition will be considered.[8] Here, Kirkpatrick's petition is appropriate because he has no other plain, speedy, and adequate remedy.

## Standing

The district court concluded that Kirkpatrick lacked standing to challenge Sierra's marriage. Indeed, NRS 125.320(1) states that a marriage is voidable only on the insistence of one of the parties to the marriage. Here, however, the question of standing goes to whether Kirkpatrick is entitled to have us decide the merits of his petition—whether he was denied his right to due process under the circumstances and whether the district court failed to follow legal requirements in granting Sierra permission to marry.

To establish standing, Kirkpatrick must show that he has suffered an injury in fact, that there is a causal connection between the injury and the conduct complained of, and that it is likely that the injury will be redressed by a favorable decision.[9] Here, Kirkpatrick complains of the loss of his parent-child relationship without the benefit of due process. There is a causal connection between this injury and Nevada's marriage consent statute as applied in this case, and a ruling in Kirkpatrick's favor by this court will remedy the injury. Accordingly, we conclude that Kirkpatrick has standing to challenge the validity of Nevada's marriage consent statute.

## Constitutional challenges to the marriage consent statute

As mentioned, NRS 122.025 permits a minor less than sixteen years old to marry if the minor has the consent of one parent and authorization from the district court.[10] In his petition, Kirkpatrick

---

[7]NRS 34.170.

[8]*Smith v. District Court,* 107 Nev. 674, 818 P.2d 849 (1991).

[9]*Allen v. Wright,* 468 U.S. 737, 751 (1984); *see also Elley v. Stephens,* 104 Nev. 413, 416, 760 P.2d 768, 770 (1988).

[10]NRS 122.025 provides in full:

    1. A person less than 16 years of age may marry only if he has the consent of:

    (a) Either parent; or

    (b) Such person's legal guardian, and such person also obtains authorization from a district court as provided in subsection 2.

asserts that, because the consent of only one parent was required, he was deprived of his fundamental right to the parent-child relationship without a compelling reason.[11] In effect, Sierra's marriage places her beyond his parental control and releases him, without opportunity to be heard, from his obligations as her father. He may no longer enforce parental rules and restrictions upon her, as he no longer has parental rights and responsibilities for her care, custody, control and support. Likewise, Sierra may no longer look to him for her care and support. Additionally, Kirkpatrick maintains that his procedural due process rights were infringed upon because he was not provided with notice and an opportunity to be heard and to object to his daughter's marriage before the court authorized it. Thus, Kirkpatrick raises both substantive and procedural due process challenges to Nevada's marriage consent statute.[12]

*Substantive due process*

The Federal and Nevada Constitutions provide that no person shall be deprived of life, liberty, or property without due process of law.[13] Essentially, "the State owes to each individual that process which, in light of the values of a free society, can be characterized as due."[14] Substantive due process ensures that state action is not random and unpredictable; it restricts the govern-

---

2. In extraordinary circumstances, a district court may authorize the marriage of a person less than 16 years of age if the court finds that:
   (a) The marriage will serve the best interests of such person; and
   (b) Such person has the consent required by paragraph (a) or (b) of subsection 1.

Pregnancy alone does not establish that the best interests of such person will be served by marriage, nor may pregnancy be required by a court as a condition necessary for its authorization for the marriage of such person.

[11]We note that although Sierra has turned sixteen and is no longer subject to the provisions of NRS 122.025, this petition is not moot because Kirkpatrick's claim falls within an exception to the mootness doctrine for matters that are capable of repetition, yet evading review. *See Binegar v. District Court,* 112 Nev. 544, 548, 915 P.2d 889, 892 (1996).

[12]Although the parties addressed these issues in the petition and answer filed in this court, Sierra contends that because Kirkpatrick did not raise these issues before the district court, these issues are not properly before us. *See Wolff v. Wolff,* 112 Nev. 1355, 1363-64, 929 P.2d 916, 921 (1996) (stating that an issue not raised in the district court is considered waived on appeal). Because this petition raises important constitutional issues, we will consider them. *See McNair v. Rivera,* 110 Nev. 463, 468 n.6, 874 P.2d 1240, 1244 n.6 (1994) (recognizing that this court can consider constitutional issues sua sponte).

[13]U.S. CONST. amend. XIV, § 1; Nev. Const. art. 1, § 8(5).

[14]*Boddie v. Connecticut,* 401 U.S. 371, 380 (1971).

ment's ability to interfere with a person's life, liberty, or property.[15]

A liberty interest is deemed fundamental, and thus protected by the Fourteenth Amendment, if it is "deeply rooted in this Nation's history and tradition."[16] The United States Supreme Court has recognized certain family privacy rights as fundamental rights,[17] and has decisively declared that a parent has a fundamental liberty interest in the care, custody, and management of his or her child.[18] "It is cardinal with [the Supreme Court] that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."[19]

A fundamental parental interest in the integrity of the family unit is not automatic, however.[20] Biology alone does not create a fundamental liberty interest in the parent-child relationship; the parental relationship must show a greater connection with the

[15]*See Licari v. Ferruzzi,* 22 F.3d 344 (1st Cir. 1994); John E. Nowak & Ronald D. Rotunda, *Constitutional Law* § 11.4, at 382 (5th ed. 1995).

[16]*Moore v. East Cleveland,* 431 U.S. 494, 503 (1977).

[17]*See id.* at 498-500 (concluding that the fundamental right of family privacy includes a right of persons related by blood, adoption, or marriage to live together as a family); *Pierce v. Society of Sisters,* 268 U.S. 510, 534-35 (1925) (holding that a parent has a fundamental right to oversee the upbringing and education of his or her child); *Meyer v. Nebraska,* 262 U.S. 390, 399 (1923) (announcing a liberty interest "to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children").

[18]*See, e.g., Santosky v. Kramer,* 455 U.S. 745, 753 (1982); *see also Troxel v. Granville,* 530 U.S. 57, 65 (2000) (stating that "the interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by this Court"); *Parham v. J.R.,* 442 U.S. 584, 602 (1979) ("Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children.").

[19]*Prince v. Massachusetts,* 321 U.S. 158, 166 (1944).

[20]*See Michael H. v. Gerald D.,* 491 U.S. 110, 124 (1989) (denying legal paternity where biological father's relationship with mother was unsubstantial); *Lehr v. Robertson,* 463 U.S. 248, 261 (1983) (noting that the mere existence of a biological link to a child is insufficient to give the unwed father protection under due process if he has not demonstrated a parental relationship); *Caban v. Mohammed,* 441 U.S. 380, 392 (1979) (recognizing that an unwed father does not have a right to block the adoption of his biological child by the child's stepfather when the unwed father has not participated in the rearing of the child); *Quilloin v. Walcott,* 434 U.S. 246, 255 (1978) (holding that the rights of the unwed father were not violated by the court's refusal to allow him to block adoption by the stepfather of an eleven-year-old child, where the unwed father had not previously participated in the child's life).

child.[21] "[T]he demonstration of commitment to the child through the assumption of personal, financial, or custodial responsibility may give the natural parent a stake in the relationship with the child rising to the level of a liberty interest."[22] Thus, divorce does not change the nature of the right.[23] Because Kirkpatrick has consistently demonstrated paternal commitment to Sierra, through custody and visitation, he has a fundamental liberty interest in the parent-child relationship. The existence of this liberty interest does not end our analysis, however.

Outside of the family law context, the Supreme Court generally utilizes a two-tier system for analyzing claims alleging that the state has violated substantive due process rights.[24] If the challenged legislation impinges upon a fundamental constitutional right, the Court will strictly scrutinize the statute. The statute must serve a compelling state interest and be narrowly tailored to serve the compelling interest in order to survive the scrutiny.[25] If, however, no fundamental right is involved, then the state only has to show that the action supports a legitimate objective and is rationally related to accomplishing the objective.[26] In family privacy cases, however, the Court has deviated from the usual two-tiered scheme.[27] Various child rearing and custody cases demonstrate the Court's application of a more flexible "reason-

---

[21]*See Michael H.*, 491 U.S. at 123; *see also Lehr*, 463 U.S. at 262 (stating that "[t]he significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring").

[22]*Hodgson v. Minnesota*, 497 U.S. 417 (1990) (striking down statutory requirement that both parents of a minor be notified before minor undergoes abortion); *accord Stanley v. Illinois*, 405 U.S. 645, 658 (1972) (invalidating Illinois statute declaring children of unwed fathers wards of the state upon their mothers' death without regard to the fathers' parental fitness).

[23]*Prisco v. U.S. Dept. of Justice*, 851 F.2d 93, 97 (3d Cir. 1988) (recognizing that a divorced father has a significant due process interest if his child is placed in the Witness Protection Program), *overruled on other grounds by Acierno v. Cloutier*, 40 F.3d 597 (3d Cir. 1994).

[24]The Court has created an exception and applies a different standard in cases involving abortion. *See, e.g., Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 876 (1992) (plurality opinion) (utilizing an intermediate level of scrutiny which applies an "undue burden" test on state actions regarding abortion).

[25]*See Washington v. Glucksberg*, 521 U.S. 702, 721 (1997); *Lulay v. Lulay*, 739 N.E.2d 521, 529 (Ill. 2000); *Wolinski v. Browneller*, 693 A.2d 30, 37 (Md. Ct. Spec. App. 1997); *see also* Nowak & Rotunda, *supra* note 15, § 10.6(a), at 348.

[26]*Glucksberg*, 521 U.S. at 728.

[27]*See generally* David D. Meyer, *The Paradox of Family Privacy*, 53 Vand. L. Rev. 527 (2000).

ableness'' test, which ''implicitly calibrat[es] the level of scrutiny in each case to match the particular degree of intrusion upon the parents' interests.''[28]

With this more flexible approach in mind, we turn to NRS 122.025 which provides that the minor must obtain the consent of one parent or a guardian; then, in extraordinary circumstances, the district court may authorize the marriage if the court finds that it will serve the minor's best interests.[29] Here, the marriage consent statute, as applied to minors under sixteen, is not intended to infringe upon the non-consenting parent's liberty interest in his or her relationship with the minor. The statute's primary purpose is to provide restricted circumstances in which a minor under the age of sixteen may marry. Thus, the statute recognizes that minors have some limited interest in applying for permission to marry.[30] By requiring the consent of only one parent,[31] the statute implicitly recognizes the common reality of modern families: a significant percentage of children under the age of eighteen live in single-parent households.[32] In other words, the statute attempts to

---

[28]*Id.* at 546; *see also* David D. Meyer, *Lochner Redeemed: Family Privacy After Troxel and Carhart,* 48 UCLA L. Rev. 1125 (2001) (examining the Supreme Court's application of a ''reasonableness'' test when balancing competing liberty interests in family-privacy jurisprudence); David D. Meyer, *Family Ties: Solving the Constitutional Dilemma of the Faultless Father,* 41 Ariz. L. Rev. 753, 838-42 (1999) (discussing whether the Supreme Court in family privacy cases applies a strict scrutiny standard or a reasonableness test) [hereinafter *Faultless Father*].

[29]NRS 122.025. For a thorough discussion of the statute's requirements, see *infra* text accompanying notes 42-61.

[30]The Supreme Court has stated that adults have a fundamental right to marry; the Court has also made clear that states can regulate marriage with respect to bigamy, incest or under-age marriages. *See Zablocki v. Redhail,* 434 U.S. 374, 392 (1978) (Stewart, J., concurring); *id.* at 399 (Powell, J., concurring); *id.* at 404 (Stevens, J., concurring).

[31]Prior to 1975, the statute required the consent of both parents. *See* 1975 Nev. Stat., ch. 764, § 3, at 1817-18. The statute was amended in 1977 to allow either parent to consent. *See* 1977 Nev. Stat., ch. 145, § 2, at 279. The legislative history reveals the change was supported by the Nevada wedding chapel industry. Because the earlier version required the consent of both parents, minors who had traveled to Nevada with only one parent to provide consent were being turned away, unable to obtain the necessary judicial authorization. *See* Hearing on A.B. 298 Before the Assembly Committee on Commerce, 59th Leg. (Nev., February 10, 1977). Clearly, when the Legislature adopted the 1977 amendment, it did not consider the possible due process consequences for the non-consenting parent which we examine today. The Legislature was obviously attempting to devise a procedure for a minor under the age of sixteen to apply to marry when obtaining the consent of both parents is an onerous burden or an impossible task. By continuing to require judicial oversight and by allowing judicial authorization only in extraordinary circumstances, the Legislature sought to protect the child's best interests.

[32]*See Troxel,* 530 U.S. at 63 (noting that in 1996, 28 percent of all children in the United States under the age of eighteen lived with only one parent).

strike a balance between a minor's limited interest in marriage, the consenting parent's and the state's interest in the minor's welfare, and the status of families today.

Because Nevada's statute attempts to strike a balance between various interests, and since its purpose is not to intrude on the parent-child relationship of any parent, we conclude that, at least with respect to minors close to sixteen years old, it is a reasonable framework for regulating the marriage of such minors. Thus, the marriage consent statute passes substantive due process scrutiny, as applied to this case. Turning to an analysis of procedural due process, however, we conclude that NRS 122.025, as applied, deprived Kirkpatrick of procedural due process protection to which he was entitled.

### Procedural due process

To state a procedural due process violation claim under the Fourteenth Amendment's Due Process Clause, the claimant must allege facts showing that the state has deprived him or her of a liberty interest and has done so without providing adequate procedural protections.[33] Once a court has determined that a protected liberty interest has been impaired, "the question remains what process is due."[34] As the Supreme Court has recognized, "[f]or all its consequence, 'due process' has never been, and perhaps never can be, precisely defined."[35] Accordingly, exactly what procedure is required in any given case depends upon the circumstances. Due process "is not a technical conception with a fixed content unrelated to time, place and circumstances."[36] Rather, it "is flexible and calls for such procedural protections as the particular situation demands."[37] The most basic requirement of due process, however, is "the opportunity to be heard 'at a meaningful time and in a meaningful manner.' "[38]

To determine what procedure satisfies due process, the specific

---

[33]Nowak & Rotunda, *supra* note 15, § 13.1, at 510.

[34]*Morrissey v. Brewer,* 408 U.S. 471, 481 (1972).

[35]*Lassiter v. Department of Social Services,* 452 U.S. 18, 24 (1981).

[36]*Cafeteria Workers v. McElroy,* 367 U.S. 886, 895 (1961) (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 162 (1951) (Frankfurter, J., concurring)) (quotation marks omitted), *overruled on other grounds by Board of Regents v. Roth,* 408 U.S. 564 (1972).

[37]*Morrissey,* 408 U.S. at 481.

[38]*Mathews v. Eldridge,* 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552 (1965)).

case must be analyzed using the three-part balancing test delineated by the Supreme Court in *Mathews v. Eldridge*: (1) the private interest impacted by the government action; (2) the chance that the procedures used will result in an improper deprivation of the private interest and the likely value of added procedural protections; and (3) the government's interest in the proceedings and the cost of additional procedural protections.[39]

### Private interest

Kirkpatrick has maintained an active role in Sierra's life. Their relationship has been continuous since the 1990 divorce. As established previously, Kirkpatrick has a protected liberty interest in his relationship with his daughter. While the intent of the statute is to allow, under extraordinary circumstances, the marriage of minors under the age of sixteen, the statute's application here terminated Kirkpatrick's right to the care, custody and control of his daughter without first providing him the opportunity to be heard.

The statute recognizes that minors like Sierra are not able to make the decision to marry independently. The district court is charged with the responsibility to evaluate these minors' best interests, and the existence of extraordinary circumstances. " 'The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions.' "[40] Consequently, providing the non-consenting but interested parent an opportunity to be heard on the marriage issue serves both the interests of that parent *and* the minor. We stress that not all nonconsenting parents have a protected liberty interest that requires them to receive notification and an opportunity for participation. Only in those cases with a non-consenting parent who has an on-going relationship, established through personal, financial, or custodial responsibility, must notice and a chance to participate be provided.[41] Here, affording Kirkpatrick an opportunity for meaningful participation in the court's authorization decision does not

---

[39]424 U.S. at 335.

[40]*Troxel*, 530 U.S. at 68 (quoting *Parham*, 442 U.S. at 602).

[41]We note that the Supreme Court has recognized a liberty interest in the parent-child relationship of the father who actively participates in the child's life, *see Caban*, 441 U.S. 380, and has declined to recognize a liberty interest in the father who has failed to demonstrate a significant bond with the child, *see Lehr*, 463 U.S. 248; *Quilloin*, 434 U.S. 246. The Court has not, however, addressed the situation where the parent has failed, through no fault of his or her own, to create the requisite relationship with the child to warrant constitutional protection. *See Faultless Father, supra* note 28, at 763-64. Accordingly, great care must be taken by the district court when deciding whether a non-consenting parent is entitled to notice.

impinge on Sierra's limited interest in applying for permission to marry.

### Chance that procedures resulted in improper deprivation

Given the utter lack of procedural protections under the circumstances, the risk that Kirkpatrick was improperly deprived of his liberty interest with respect to his daughter is great. Moreover, procedural safeguards would not only enhance the likelihood that Kirkpatrick's rights as Sierra's parent are not substantively altered without his knowledge, but also ensure that Sierra's best interests are served.

### Government's interest and the cost of additional protections

Finally, the burden on the district court to provide the non-consenting parent an opportunity to participate in the proceedings is minimal. The district court, in deciding whether to authorize the minor's marriage, must necessarily determine whether the minor's best interests are served by the proposed marriage. Including the non-consenting parent in appropriate cases will not create a significant additional administrative or judicial burden on the court. Notably, the non-consenting parent does not have veto power over the proceedings, but simply must be permitted the opportunity to participate in a meaningful way in the important decision of whether the minor should be granted permission to marry.

In sum, the *Mathews* factors all point to the same result: under the circumstances presented here, Kirkpatrick was entitled to notice and a meaningful opportunity to be heard before the district court determined whether Sierra could marry. Kirkpatrick was denied such protections, however, and his due process rights were violated.

### Interpretation of Nevada's marriage consent statute

In his petition, Kirkpatrick asserts that the district court manifestly abused its discretion when it failed to identify any extraordinary circumstances warranting Sierra's marriage to a forty-eight-year-old man, and when it failed to expressly consider Sierra's best interests.

As explained previously, in Nevada, a child under the age of sixteen is legally incapable of contracting to marry without the consent of one parent or the legal guardian, and authorization from a district court; these requirements are set forth in NRS 122.025.[42] Under this statute, a two-tiered approach has been

---

[42]*See also* NRS 122.010 (stating that marriage is a civil contract that requires the consent of the parties capable in law of contracting).

adopted. Specifically, the minor must obtain the consent of one parent or a guardian; then, "[i]n extraordinary circumstances, a district court may authorize the marriage of a person less than 16 years of age if the court finds that . . . [t]he marriage will serve the best interests of such person."[43] Moreover, pregnancy alone does not establish that the minor's best interests will be served by marriage, nor is pregnancy required by the court as a condition necessary for its marriage authorization.[44] Thus, under the statute, any judicial authorization must be based on the court's determination that extraordinary circumstances warranting the marriage exist, and that the minor's best interests will be served. The court cannot base these determinations on pregnancy alone.

Kirkpatrick contends that the district court manifestly abused its discretion when it failed to "independently inquire" as to what "extraordinary circumstances" existed to warrant a fifteen-year-old marrying, and how it is in Sierra's best interest to marry a forty-eight-year-old man. Sierra argues that the district court complied with the statutory provision when it obtained Karay's consent for Sierra's marriage and subsequently authorized the marriage.

We have not previously examined the language of the marriage consent statute. Our statutory construction rules are well established, however. When interpreting a statutory provision, the "words in a statute should be given their plain meaning unless this violates the spirit of the act."[45] Thus, "[w]here the language of a statute is plain and unambiguous, and its meaning clear and unmistakable, there is no room for construction, and the courts are not permitted to search for its meaning beyond the statute itself."[46] Ambiguity exists if reasonable persons can ascribe different meanings to a statute.[47] Once a statute is termed ambiguous, the plain meaning rule has no application, and "[t]he leading rule of statutory construction is to ascertain the intent of the legislature in enacting the statute. This intent will prevail over the literal sense of the words. . . . The entire subject matter and policy may be involved as an interpretive aid."[48] When interpreting an

---

[43]NRS 122.025(2)(a).

[44]NRS 122.025.

[45]*McKay v. Bd. of Supervisors,* 102 Nev. 644, 648, 730 P.2d 438, 441 (1986).

[46]*Charlie Brown Constr. Co. v. Boulder City,* 106 Nev. 497, 503, 797 P.2d 946, 949 (1990) (quotation omitted), *overruled on other grounds by Calloway v. City of Reno,* 116 Nev. 250, 993 P.2d 1259 (2000).

[47]*McKay,* 102 Nev. at 649, 730 P.2d at 442.

[48]*Id.* at 650-51, 730 P.2d at 443 (citation omitted).

ambiguous statute, the provisions should be construed " 'in line with what reason and public policy' " dictate.[49]

*Black's Law Dictionary* defines "extraordinary circumstances" as "out of the ordinary."[50] While the dictionary provides a clear definition of the term, the parties contend that the term as used in the statute can be read two ways and is therefore ambiguous. Specifically, Kirkpatrick asserts that the term "extraordinary circumstances" refers to something unusual arising that necessitates the marriage of someone under sixteen. Sierra maintains that "extraordinary circumstances" exist any time someone under the age of sixteen wishes to marry. As the parties point out, it is unclear from the language of the statute whether extraordinary circumstances exist merely because the minor is so young, or whether the term is intended to limit the district court's discretion in giving authorization.

Thus, we turn to the statute's legislative history for guidance. In 1957, the Legislature originally adopted Nevada's marriage consent statute for persons less than sixteen years of age; it provided that "the district court may authorize the marriage of females under the age of 16 years or males under the age of 18 years upon the written consent of the parents or guardian of any such person."[51] Although this version gave the district court discretion to authorize a marriage, it provided no express guidance to the district court in exercising its discretion.

Nearly twenty years later, in 1975, the Legislature amended the statute.[52] The amendment eliminated the gender distinctions and specifically addressed the circumstances in which a minor under the age of sixteen could petition the court to marry. The statutory amendment expressly provided that in "extraordinary circumstances" the district court could, after considering the minor's best interests and obtaining parental consent, grant permission for the minor to marry.[53] The 1975 amended version of the statute read much like the current version, except that the earlier version required the consent of both parents, or the custodial parent if the minor was living with only one parent.[54]

The legislative history reveals that the 1975 amendment was intended, in large part, to address the Legislature's concern with minors under the age of sixteen marrying.[55] During the hearings,

---

[49]*Id.* at 649, 730 P.2d at 442 (quoting *Robert E. v. Justice Court,* 99 Nev. 443, 445, 664 P.2d 957, 959 (1983)).

[50]*Black's Law Dictionary* 406 (abr. 6th ed. 1991).

[51]1957 Nev. Stat., ch. 225, § 1, at 316.

[52]1975 Nev. Stat., ch. 764, § 3, at 1817-18.

[53]*Id.*

[54]*Id.*

[55]*See* Hearing on S.B. 433 Before the Senate Committee on Judiciary, 58th Leg. (Nev., April 3, 1975).

one senator stated that "the intent of the bill was that persons over 18 could be married; persons between the ages of 16 and 18 needed parental consent; and persons under 16 needed both parental consent and a decree from the district court, with the understanding that this would be given only under extraordinary circumstances."[56] At a subsequent hearing, another senator stated that he understood from the committee's discussion that the committee desired to "restrict the marriage of persons under the age of 16 as much as possible."[57] In 1977, the Legislature again amended the statute, to its current form, which only requires the consent of one parent.[58] The amendment in no way affected the requirement that the district court find extraordinary circumstances and that the marriage is in the minor's best interest.

Based on the Legislature's clear directive that minors under the age of sixteen be permitted to marry in only very limited situations, we conclude that the term "extraordinary circumstances" necessarily requires that the court find something out of the ordinary justifying the marriage of a minor under the age of sixteen. Although extraordinary circumstances must necessarily be determined on a case-by-case basis, some possibilities, though not exhaustive, include: (1) the prospective spouse is in the armed services or is relocating abroad for a career opportunity; (2) it is the common practice in the culture of the minor's family for minors under the age of sixteen to marry; (3) the minor is terminally ill and wishes to marry before dying; or (4) the minor is not supported physically, financially or emotionally by his or her parents and demonstrates the requisite maturity to engage in a marital relationship. Since the statute does not limit the youngest age at which a minor may seek judicial permission to marry, greater judicial protection is required for younger minors. Although the statute is silent as to whether the court must make express written findings that extraordinary circumstances exist, we conclude that the court may not authorize the marriage without first expressly finding such circumstances.[59] Here, it is unknown whether extraordinary circumstances existed to warrant Sierra's marriage to a forty-eight-year-old man. Because the district court failed to explain that anything out of the ordinary would justify

---

[56]*Id.*

[57]Hearing on S.B. 433 Before the Senate Committee on Judiciary, 58th Leg. (Nev., May 17, 1975).

[58]1977 Nev. Stat., ch. 145, § 2, at 279.

[59]*See Anastassatos v. Anastassatos,* 112 Nev. 317, 913 P.2d 652 (1996) (concluding that child support statutory guidelines demand that the district court make specified written findings of fact when a deviation from the statutory formula is necessary).

Sierra's marriage, we conclude that the district court manifestly abused its discretion in authorizing it.

Even after the district court makes a threshold determination that extraordinary circumstances exist, the court must find that the marriage is in the minor's best interests. Considerations of the minor's maturity, his or her family relationships, his or her future plans, the length and stability of the minor's relationship with the prospective spouse, the minor's ability and the prospective spouse's ability to provide care and support for the marital unit, the suitability and fitness of the prospective spouse, and whether the minor or prospective spouse is pregnant, as well as other pertinent factors, may assist the court in determining whether a proposed marriage is in the minor's best interests.

In addition, the district court must consider input from the minor's parents or guardian, including any non-consenting parent with an established parent-child relationship. The parents or guardian can offer the court valuable insight, as they have first-hand knowledge about the minor's history, disposition, maturity, self-esteem and personality.[60] Information gathered by the district court from the parents or guardian of the minor child is necessary for the court to make an informed decision as to whether the marriage is in the minor's best interests. Even after considering the parents' or guardian's observations, however, the court must make an independent decision regarding the minor's best interests. Judicial oversight is required by the statute to ensure that the minor's parents or guardian act with the minor's best interests in mind, and that based upon the evidence, the minor's life will be enhanced by the marriage.[61] The district court's determination to permit a minor under sixteen years of age to marry is a substantive one to be made only after careful inquiry. Here, the district court made its decision without conducting a hearing, or even interviewing Sierra, Crow, Karay, or Kirkpatrick. The court only considered Karay's conclusory affidavit.

The marriage consent statute is silent as to whether the district court must make express written findings that the marriage is in the minor's best interests. Nevertheless, the enormity of the decision to marry and the state's interest in ensuring that the marriage

---

[60]*Developments in the Law—The Constitution and the Family,* 93 Harv. L. Rev. 1156, 1353-54 (1980) (stating that "the closeness of the familial relationship provides strong assurance that parents will use their special knowledge of the child to act in his best interests").

[61]*See generally* Lynn D. Wardle, *Rethinking Martial Age Restrictions,* 22 J. Fam. L. 1 (1983-84); Comment, *Capacity, Parental Power, and a Minor's Right to Remain Married,* 22 Santa Clara L. Rev. 447 (1982); Sandra J. Chan, Note, *The Constitutionality of Parental Consent Requirements in Minor Marriages,* 12 U.C. Davis L. Rev. 301 (1979).

is in the minor's best interests necessitate that the district court make written findings to support its conclusion concerning whether the best interests of the child are served by permitting the child to marry. The child's best interests are too important and fundamental to countenance our approval of the district court's lack of inquiry in this case. The statute exists for the obvious reason that children under sixteen years of age are considered, absent extraordinary circumstances, to be too immature to make such a weighty decision in life without a parent's consent. Judicial oversight is required by the statute to ensure that the child's parent(s), who consent to the marriage, are acting with the child's best interests in mind. Here, the district court summarily, without a hearing, and with nothing but a deficient affidavit before it, found that good cause exists under the statute for the marriage and ordered the issuance of a marriage license so that Sierra could marry Crow. The district court did not indicate whether and why the marriage was in Sierra's best interests.

In sum, the district court manifestly abused its discretion by failing to meaningfully inquire into and make express written findings as to whether the marriage was mandated by exceptional circumstances and in Sierra's best interests. The district court's failure to address in any meaningful way these issues amounted to an abrogation of its duties under the statute.

### CONCLUSION

As applied in this case, NRS 122.025 violated Kirkpatrick's due process rights because his protected liberty interest in the parent-child relationship was infringed upon without notice and a meaningful opportunity to be heard. Additionally, the district court manifestly abused its discretion when it authorized Sierra's marriage without expressly finding that extraordinary circumstances existed and that the marriage was in Sierra's best interests. Because the consent to marry was not properly obtained from the district court, the marriage of Sierra and Crow is void.[62] Accordingly, we grant Kirkpatrick's petition and direct the clerk of this court to issue a writ of mandamus compelling the district court to vacate its order authorizing a marriage license and to annul the marriage.[63]

---

[62]NRS 125.320(1) states that ''[w]hen the consent of the . . . district court, as required by NRS 122.020 or 122.025, has not been obtained, the marriage is void from the time its nullity is declared by a court of competent jurisdiction.''

[63]See NRS 125.300. We note that this opinion should not be read to suggest that all marriages previously authorized under NRS 122.025 are now void. Until a marriage has been annulled in a proper proceeding, it is presumed valid. See Kirby v. Gilliam, 28 S.E.2d 40 (Va. 1943); see generally

Rose and Leavitt, JJ., concur.

Becker, J., concurring:

I agree with the majority that petitioner's due process rights were compromised in the application of the Nevada marriage consent statute. I write separately to make two points.

First, petitioner's separate attack claiming that the district court abused its discretion with regard to the merits of the petition to approve his daughter's marriage, standing alone, was rendered moot by the subsequent marriage of his daughter pursuant to the district court's order. This is because, until attacked, the district court's order enjoyed presumptive validity and the marriage was likewise presumptively valid. This marriage effectively emancipated the daughter and cut off petitioner's parental rights. Thus, the only vehicle for petitioner to assert standing was the separate due process challenge that has been embraced by our majority today. It was therefore necessary to reach the constitutional question in order to grant relief.

Second, the majority suggests that notice to both parents, and an opportunity to be heard, is required before a court may grant permission for a minor to marry under the statute. While I agree that any objections of a committed and concerned parent are best raised before a petition to marry is granted, I conclude that a parent's constitutional interests are protected if he or she is given the opportunity to challenge a petition before or after it has been granted. In this connection, I would underscore the fact that we have not declared the marriage consent statute constitutionally infirm, except in its particular application here.

Young, J., dissenting:

I respectfully disagree.

NRS 122.025 has existed as the law in Nevada in its present form for the past twenty-five years without incident. This is, to some extent, the sign of a good piece of legislation, balancing the needs of society and judicial economy. The majority now brings uncertainty into application of the statute where none before existed.

The statute provides that a person under the age of sixteen must obtain the consent of either parent and court approval before he or she may marry. Here, the court was presented with an affidavit signed by Sierra's mother consenting to the marriage. The court approved of the marriage. In my view, the court complied with NRS 122.025 and the couple is married. NRS 125.320(2) provides that the marriage may be annulled only when a minor fails to comply with NRS 122.025. Whether we personally agree or

---

*Picarella v. Picarella*, 316 A.2d 826 (Md. Ct. Spec. App. 1974); *State ex. rel. v. Farmer*, 523 S.E.2d 840 (W. Va. 1999).

disagree with the propriety of the marriage is not the issue before us—we should respect this union. ··

Marriage is a constitutionally protected right.[1] It is the corner-stone of the family and our civilization.[2] As marriage comprises the most sacred of relationships,[3] the decision of whom and when to marry is highly personal, often involving reasons that are complex and vary from individual to individual. There is no one set of criteria that can be set forth as a litmus test to determine if a marriage will be successful. The decision to marry should rest primarily in the hands of the individual, with little government interference.[4]

Naturally, however, as a society we recognize that reasonable constraints on the right to marry are appropriate,[5] especially when the marriage involves a minor. To serve this end, the Legislature of Nevada required that a minor who wishes to marry obtain the consent of either parent and court approval.[6] Yet, recognizing the varied circumstances and reasons that may exist in motivating minor applicants to petition the court for permission to marry, the Legislature left the phrase ''extraordinary circumstances'' unde-fined in order to afford the broadest possible discretion to the courts to exercise their judgment. The statute expressly provides that pregnancy alone is not to be a deciding factor either way. If the Legislature intended to limit what constitutes ''extraordinary circumstances,'' it certainly could have done so.

If NRS 122.025 is outdated or requires an amendment, this is the responsibility of the Legislature, not the judiciary. The role of the judiciary is to interpret law,[7] not rewrite it. Ironically, here, the majority acknowledges that ''the statute is silent as to whether the court must make express written findings that extraordinary circumstances exist.'' Yet, the majority proceeds to fault the court for not making any such express findings. The majority also holds that an absentee parent must be given notice and an opportunity to be heard. However, the effect of such a requirement is to involve input from two parents in the decision-making process, where the Legislature clearly required only one. In essence, the majority is rewriting the statute by requiring new procedural requirements the Legislature did not intend.

---

[1]*Zablocki v. Redhail*, 434 U.S. 374, 384 (1978).

[2]*Id.*

[3]*Griswold v. Connecticut*, 381 U.S. 479, 486 (1965).

[4]*See Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 639-40 (1974).

[5]*See Zablocki*, 434 U.S. at 392 (Stewart, J., concurring in judgment).

[6]NRS 122.025.

[7]*See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

A balancing of interests is conducted to determine when procedural due process protections are warranted.[8] These are the private interests impacted by the government action, the chance that the procedure used will result in an erroneous deprivation, the likely value of added protections, and the financial and administrative burdens of additional protections.[9]

Here, in applying the balancing test, the majority emphasizes the loss to Kirkpatrick's liberty interests in his parent-child relationship as the result of Sierra's marriage without notice or his consent. However, the United States Supreme Court has stated that a "two-parent notification requirement is an oddity among state and federal consent provisions governing the health, welfare, and education of children."[10]

Additionally, what is the value of having Kirkpatrick appear and voice objection to a marriage when he would still be without any legal authority to prevent the marriage? Sierra's mother consented to the marriage. The United States Supreme Court has stated that "there is a presumption that fit parents act in the best interests of their children."[11] Here, there is no evidence that Sierra's mother is an unfit parent. Deference should be given to her judgment.[12]

The majority also states that "[i]ncluding the non-consenting parent in appropriate cases will not create a significant additional . . . burden on the court." However, judicial notice is taken of the fact that 130 minors have filed petitions seeking court approval for marriage in Clark County over the past three years.[13] The majority now requires notice to two parents, a full hearing, and the court to make written findings. Such requirements give rise to a number of problems. For example, what happens when the absent parent cannot be located or the parties cannot afford an attorney? What is the effect on the marriages that have already occurred under NRS 122.025? Increased litigation and burdens on an already backlogged judiciary are foreseeable.

The legislative history of NRS 122.025 shows that it was specifically amended in 1977 to require that minors wishing to marry must obtain the consent of either parent.[14] The Legislature recognized the domestic reality that a growing number of minors

---

[8]*Mathews v. Eldridge,* 424 U.S. 319, 334-35 (1976).

[9]*Id.* at 335.

[10]*Hodgson v. Minnesota,* 497 U.S. 417, 454 (1990).

[11]*Troxel v. Granville,* 530 U.S. 57, 68 (2000).

[12]*See Yoder v. Yoder,* 721 P.2d 294, 297 (Kan. Ct. App. 1986).

[13]Statistics compiled by the Eighth Judicial District Court, Family Division, show the number of minors petitioning for marriage are the following: forty-seven in 1999; forty in 2000; and forty-three in 2001.

[14]*See* Hearing on A.B. 298 Before the Assembly Commerce Committee, 59th Leg. (Nev., February 23, 1977).

live in single-parent homes[15] and that requiring the consent of two parents causes "a lot of problems."[16]

Moreover, I would be remiss not to recognize that the Legislature also considered Nevada's economic interest in attracting couples who wish to marry.[17] Many states require only one-parent consent for minors to marry in varying circumstances.[18] Why would couples come to Nevada to marry if our law is burdensome? Nevada depends on tourism. The Legislature did not want Nevada at a disadvantage with other states.

Sierra is now sixteen years old and can remarry without court approval. This issue is therefore moot and the majority decision achieves nothing, other than in some ways to disrupt the marriage. Only time, not the law, will be the true judge of whether the marriage ultimately serves Sierra's best interest. This case represents less than one percent of petitions filed in Clark County in the past three years for minors to marry. Left alone, a similar issue will perhaps not arise for another twenty-five years. Our energies can better serve public interest if directed elsewhere.

SHEARING, J., with whom MAUPIN, C. J., agrees, dissenting:

I agree with JUSTICE YOUNG's dissent and would also deny Bruce Kirkpatrick's petition for a writ of mandamus. The district

---

[15]*See Hodgson,* 497 U.S. at 437 ("Approximately one out of every two marriages ends in divorce.").

[16]Hearing on A.B. 298 Before the Assembly Commerce Committee, 59th Leg. (Nev., February 23, 1977) (statement of George Flint, Nevada Wedding Association).

[17]*See* Hearing on A.B. 298 Before the Senate Judiciary Committee, 59th Leg. (Nev., March 18, 1977).

[18]Ariz. Rev. Stat. Ann. § 25-102(A) (West 2000 & Supp. 2001) (parent having custody); Cal. Fam. Code § 302 (West 1994); Colo. Rev. Stat. Ann. § 14-2-106(I) (2001) (parent having custody); Conn. Gen. Stat. § 46b-30(a), (b) (2001); Fla. Stat. Ann. § 741.0405(3) (West Supp. 2002) (no parent consent when pregnancy involved); Ga. Code Ann. §§ 19-3-2(2), 19-3-37(a)(2)(B) (Harrison 1998) (parent having custody); Iowa Code Ann. § 595.2(4)(a) (West 2001) (parent having custody); Kan. Stat. Ann. § 23-106 (Supp. 2001); Md. Code Ann., Fam. Law § 2-301(b)(1)(2) (Supp. 2000) (when pregnancy involved); Mich. Comp. Laws Ann. § 551.103 (West 1988); Mo. Ann. Stat. § 451.090(2) (West 1997) (parent having custody); Neb. Rev. Stat. § 42-105 (1998) (parent having custody); NRS 122.025; N.H. Rev. Stat. Ann. § 457:6 (1992) (parent having custody); N.M. Stat. Ann. § 40-1-10 (Michie 1999); N.C. Gen. Stat. § 51-2(a) (1999) (parent having custody); N.D. Cent. Code § 14-03-17(1)(a)(2) (2001) (parent having custody); Okla. Stat. Ann. tit. 43, § 3 (West 2001) (when pregnancy involved); Or. Rev. Stat. § 106.060 (2001) (no consent of non-resident parents when minor is resident); S.C. Code Ann. § 20-1-300 (Law. Co-op. 1985) (when pregnancy involved); S.D. Codified Laws § 25-1-9 (Michie 1999); Tex. Fam. Code Ann. § 2.102(b) (Vernon 1998); Utah Code Ann. § 30-1-9(2)(a)(ii) (Supp. 2001) (parent having custody); Vt. Stat. Ann. tit. 18, § 5142(1), (2) (2000); W. Va. Code Ann. § 48-2-301(d) (Michie 2001) (parent having custody); Wis. Stat. Ann. § 765.02(2) (West 2001) (parent having custody).

court was correct in determining that Kirkpatrick lacked standing to challenge the validity of his daughter's marriage. Although NRS 125.320 states that a marriage is voidable at the insistence of one of the parties to the marriage, it does not grant the parents of the parties the right to contest the marriage. Kirkpatrick's daughter's mother consented to the marriage, which the district court, therefore, properly authorized in accordance with NRS 122.025(2), a constitutional statute.

The majority holds that NRS 122.025(2) deprived Kirkpatrick of his due process rights because it did not give him notice that his daughter was seeking to marry. The majority suggests that the father's right to be notified of his daughter's petition for permission to marry is secured by the Fourteenth Amendment of the United States Constitution and Article 1, Section 8, Clause 5 of the Nevada Constitution, which provides that ''[n]o person shall be deprived of life, liberty, or property, without due process of law.'' I find it difficult to fathom how NRS 122.025(2) implicates any of Kirkpatrick's due process rights. I cannot see how the district court's failure to notify Kirkpatrick of his daughter's wish to marry, constitutes a deprivation of either life, liberty, or property. We have come a long way since children were regarded as the property of their parents, subject to their absolute control. And if anyone's liberty interest is at stake here, it is that of Sierra Crow, not her father.

The majority holds that Kirkpatrick has a fundamental right to make decisions concerning the care, custody, and control of his daughter. Basically, the majority holds that he has a fundamental right to complete control of his fifteen-year-old daughter. The majority relies on the Due Process Clause of the Nevada Constitution and the Due Process Clause of the Fourteenth Amendment of the United States Constitution to support its decision. The United States Supreme Court decisions regarding the Fourteenth Amendment do not support the conclusion here. The majority cites United States Supreme Court decisions in support of its position, while ignoring other decisions that are more on point but against its position.

The United States Supreme Court decisions that the majority cites in support of its holding all involve a dispute between a parent and the state, not a dispute between a parent and a child asserting her rights. I agree with the majority that parents have a fundamental right to control their children when the state seeks to interfere unreasonably.[1] However, parental rights are not without

---

[1]*See, e.g., Troxel v. Granville,* 530 U.S. 57 (2000) (declaring unconstitutional a state statute which gave courts broad discretion to override parental decisions over visitation); *Santosky v. Kramer,* 455 U.S. 745 (1982) (requiring a heightened standard of review for termination of parental rights cases); *Stanley v. Illinois,* 405 U.S. 645 (1972) (declaring unconstitutional a statute depriving unwed fathers of rights to their children).

limits, especially here, where we have a dispute between a parent and his daughter, who has fundamental rights of her own.

· The United States Supreme Court, in numerous cases, including *Loving v. Virginia*[2] and *Zablocki v. Redhail*,[3] has established that the right to marry is a fundamental right. In *Zablocki,* the Court, quoting *Loving,* explained that:

> The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men.
>
> Marriage is one of the ·"basic civil rights of man," fundamental to our very existence and survival.[4] ·

When Wisconsin sought to restrict the right to marry, the Supreme Court further explained in *Zablocki* that:

> It is not· surprising that the decision to marry has been placed on the same level of importance as decisions relating to procreation, childbirth, child rearing, and family relationships. As the facts of this case illustrate, it would make little sense to recognize a right of privacy with respect to other matters of family life and not with respect to the 'decision to enter the relationship that is the foundation of the family in our society. . . . Surely, a decision to marry and raise the child in a traditional family setting must receive equivalent protection. And, if appellee's right to procreate means anything at all, it must imply some right to enter the only relationship in which the State of Wisconsin allows sexual relations legally to take place.[5]

The United States Supreme Court has made it clear that constitutional rights apply to children as well as adults.[6] As the Court said in *In re Gault,* "neither the Fourteenth Amendment nor the Bill of Rights is for adults alone."[7] The Supreme Court said in *Planned Parenthood of Missouri v. Danforth,* "Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as .well as adults, are protected by the Constitution and possess constitutional rights."[8]

---

[2] 388 U.S. 1 (1967).

[3] 434 U.S. 374 (1978).

[4] *Id.* at 383 (quoting *Loving,* 388 U.S. at 12 (quoting *Skinner v. Oklahoma,* 316 U.S. 535, 541 (1942))).

[5] *Id.* at 386.

[6] *In re Gault,* 387 U.S. 1 (1967).

[7] *Id.* at 13.

[8] 428 U.S. 52, 74 (1976).

In this case, we have a clash between two sets of rights—the rights of a parent to control his daughter and the right of a daughter to marry. The United States Supreme Court has established that these rights are fundamental, but not absolute. The United States Supreme Court has held that the state has an interest in the welfare of children and may limit parental authority.[9] The Supreme Court has even held, where justified by clear and convincing evidence, that parents can be totally deprived of their children forever.[10] If the state can completely eliminate all parental rights, it can certainly limit those rights when the competing rights of the child are involved.

The Supreme Court has made it clear that in certain circumstances a child has the right to make autonomous decisions that may limit or overcome state and parental intervention. In *Carey v. Population Services International*,[11] the Court indicated that states cannot prohibit a child from procuring contraceptives. In *Hodgson v. Minnesota*,[12] the Supreme Court declared a two-parent notification requirement unconstitutional, explaining that the state's "interest in protecting a parent's interest in shaping a child's values and lifestyle" cannot "overcome the liberty interests of a minor acting with the consent of a single parent or court."[13]

The United States Supreme Court has often balanced the rights of children with the rights of parental control and intervention and held in favor of children's rights. Numerous states have enacted single parent consent laws for marriage of minors, and none has been declared unconstitutional by the United States Supreme Court.[14] The Nevada statute, as well as the other numerous state statutes, provides the appropriate balance between the right of the child to marry and the right of parental control by requiring the consent of one parent and the approval of the court for a minor to marry.

NRS 122.025(2) does not, as Kirkpatrick alleges, deprive him of a parent-child relationship with his daughter. It deprives him only of control over his daughter during the remainder of her minority. Kirkpatrick still has all the other legal and social attrib-

---

[9]*Lassiter v. Department of Social Services,* 452 U.S. 18 (1981); *see also Prince v. Massachusetts,* 321 U.S. 158, 166 (1944) (state may require school attendance, vaccination, and medical treatment, and regulate or prohibit child labor).

[10]*Santosky v. Kramer,* 455 U.S. 745, 768-69 (1982).

[11]431 U.S. 678 (1977).

[12]497 U.S. 417 (1990). In *Planned Parenthood of Missouri v. Danforth,* 428 U.S. 52 (1976), and *Bellotti v. Baird,* 443 U.S. 622 (1979), the Court declared that a minor has a right to decide to have an abortion free from parental interference.

[13]497 U.S. at 452.

[14]*See* dissenting opinion by JUSTICE YOUNG *ante* p. 257 n.18.

utes of parenthood. Contrary to what is apparently Kirkpatrick's and the majority's view, the parental relationship does not end with emancipation of the child.

The loss that results from his daughter's emancipation is totally unlike the loss suffered by parents in cases where parental rights are terminated. In *Santosky v. Kramer,* for example, the parents faced the permanent loss of any rights with regard to their biological children and grandchildren.[15] Had their parental rights been terminated, they would have henceforth been regarded in the law as strangers to their biological children as well as to their grandchildren, with the permanent loss of care, companionship, inheritance, visitation, and continuation of the parental name. There is no comparison between that drastic deprivation, which was held by the United States Supreme Court to implicate the Santoskys' due process rights, and the very short period of loss of control over his daughter that Kirkpatrick faces here.

The majority also contends that the marriage is voidable because the district court did not follow NRS 122.025(2). I disagree. The district court made the determinations required by NRS 122.025(2); namely, that in the extraordinary circumstances, the marriage was in the best interests of Sierra Crow and that she had the required consent. The statute has no requirement, as the majority suggests, for a hearing, oral testimony, or written findings of fact. The majority only imposes these requirements on the statute so as to reach a desired result.

Whatever our personal opinion of a fifteen-year-old woman marrying a forty-eight-year-old man, we must defer to the findings of the district court. The district court did not abuse its discretion by accepting the judgment of Sierra Crow's mother that she has ''seen no other couple so right for each other,'' that they ''have very real life plans at home, in the town in which we all reside,'' and that ''[t]heir partnership and their talents will be most effectively utilized by this marriage.''

Although NRS 122.025(2) deprives the non-consenting parent of some modicum of control over his or her child, it does not deprive the parent of life, liberty, or property, such that the parent's due process rights, under either the Nevada or United States constitutions, are implicated. Kirkpatrick, therefore, lacks standing to seek an annulment of his daughter's marriage, and his petition should be denied.

---

[15]455 U.S. 745.